UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAYHUE TITUS JOHNSON,

      Petitioner,

   v.

MARTIN BITER, Warden

      Respondent.

Case No.  11-5026 JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by Petitioner Mayhue Titus Johnson, challenging the validity of a judgment obtained against him in the Alameda County Superior Court.[1]  Respondent filed an answer to the petition.  Petitioner has filed a traverse.  For the reasons discussed below, the petition is DENIED as to all claims.

**PROCEDURAL HISTORY**

In 2008, an Alameda County jury found Petitioner guilty of first degree murder with enhancements for personal use and discharge of a firearm causing great bodily injury, and possession of a firearm by a felon.  Respondent's Ex. 1, Clerk's Transcript (CT) 560-64.  On January 16, 2009, the trial court sentenced Petitioner to fifty years to life in prison.  CT 576-80.

On August 4, 2010, the California Court of Appeal affirmed the judgment of conviction.  Respondent's Ex. 6; <u>People v. Johnson</u>, No. A124248, 2010 WL 3028944

---

[1] Petitioner initially named Raul Lopez, warden of Petitioner's former prison, as Respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin Biter, the warden of Kern Valley State Prison, where Petitioner is currently incarcerated, is hereby substituted as Respondent in place of Petitioner's prior custodian.

United States District Court
Northern District of California

(Cal. Ct. App. Aug. 4, 2010) (unpublished opinion).  On October 13, 2010, the California Supreme Court denied review.  Respondent's Ex. 7; Petition at 3.[2]  Petitioner did not seek habeas relief in the state courts.  Petition at 4.  On October 12, 2011, Petitioner filed the instant petition for a writ of habeas corpus in this Court.  The matter is now fully briefed and is ready for review on the merits.

## STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[3]

> In August 2005, Wallace McClinton was living in a shed at a West Oakland auto yard.  One evening, McClinton and his friend Steve Gaspari were playing video games.  Gaspari heard a metallic sound, and told McClinton it sounded like someone was in the fenced yard. When McClinton went to the door, Gaspari heard someone call McClinton by his first name and ask him, "are you stealing something from me now?"  Then Gaspari heard several shots, and saw someone in the doorway who ran away.  The man Gaspari saw was African-American, and wore a beige or tan jacket.  Earlier that day, Gaspari saw Johnson at the auto yard and had a brief conversation with him.  When the shooter called McClinton by name, Gaspari recognized the voice as Johnson's.  FN1
>
> FN1:  When he first spoke to police after the shooting, Gaspari said he thought the man in the doorway was the one who he spoke to at the yard earlier that day, but he did not really want to point the finger at anyone until he talked to someone.  Gaspari told police he thought he would recognize the man's voice if he heard it again.  When asked at the preliminary hearing whether he still had questions whether the voice he heard was Johnson's, Gaspari answered he "[did] not know it to be a fact."  At trial, Gaspari said the voice was "[k]ind of deep, deep scratchy," and he could not remember telling police anything different.  But the voice changed when the man was yelling to a higher pitch.
>
> As McClinton lay bleeding from gunshot wounds, he told Gaspari his assailant was "Booger or Booker," but Gaspari did not know who that was.  FN2  Gaspari called 9-1-1 for help and saw someone standing outside in the yard.  The person jumped over the razor-wire-topped fence into the property next door.  When the police arrived and asked McClinton who shot him, McClinton said it was an African-

---

[2] The page numbers used herein for the Petition refer to those affixed to the top of the page by the Court's electronic filing program.

[3] This summary is presumed correct.  See Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

2

United States District Court
Northern District of California

American man named Butch.  It was unclear whether anyone overheard McClinton's conversation with police.

FN2:  Gaspari did not initially tell police that McClinton identified his assailant, but testified that McClinton "didn't give me a name.  All he said was Booker or Booger. I couldn't make heads or tails of it."  A few days after the murder, Gaspari saw a newspaper article about Johnson's arrest and learned of his name for the first time.

Later that night, McClinton's friend Irma Harris was walking in the neighborhood about two blocks from the auto yard when someone who was hiding underneath a flatbed truck called to her by name and told her he just shot McClinton.  Harris could not see what the man was wearing and could "not really" see his face.  The man asked Harris to check on his dog and to see if a neighbor, Robert Hamon, would give him a ride.  Harris was a reluctant witness and declined to identify Johnson in court, although she said she had seen him before and that he looked "familiar."

Hamon also knew McClinton.  At about 3:00 a.m., Harris woke Hamon up and told him there was somebody under his truck.  When Hamon went outside to check, he heard a voice from underneath the truck and saw a man wearing dark clothing under the bed lying on top of the drive shaft.  Hamon recognized the man's voice as Johnson's, whom Hamon had known for many years by his nicknames Booker and Larry.  FN3  He last spoke with Johnson a few days earlier and knew he owned a small dog.  After he spoke to Johnson, Hamon went back to bed.  When he checked the truck later that morning, Johnson was gone.  Hamon was interviewed by police and identified Johnson in a photo lineup a few days after the shooting.  At trial, Hamon testified he had no doubt Johnson was the man who was hiding underneath his truck that night.

FN3:  Although Hamon did not see Johnson for a 15-year period, they had recently become reacquainted when Johnson moved into the neighborhood.

McClinton's friend Pedro Reyes Hernandez lived nearby and also worked at the auto yard.  The night of the shooting, he left work between 9:00 and 10:00 p.m. and locked the gate.  He was talking to friends on the corner when he heard four gunshots from the direction of the yard.  A minute or two later, he saw a man jump over the fence and onto the street.  The man was approximately six-feet tall, wearing a hooded sweatshirt and pants.  Hernandez saw "just a silhouette" and could not identify the color of the sweatshirt.  It was dark and the man was about 50 feet away from him.  The man ripped his clothes on the razor wire as he went over the fence, and he headed away from Hernandez and his friends.  When the police arrived, Hernandez unlocked the gate for them, and showed them where he saw the man jump the fence.  When he came to work after the shooting, he saw the truck Johnson drove in the yard with a barking Chihuahua inside it.  Hernandez had seen

3

Johnson with the dog the day before.

Jerry Clark was a mechanic who often parked his motor home in the neighborhood. Clark had previously met McClinton, Johnson, and Hamon in connection with his work. About a week before the shooting, Clark overheard a loud, hostile argument in a warehouse between two men he believed to be Johnson and McClinton. One night shortly thereafter, Clark was asleep in his motor home when he felt the vehicle move. He got up and discovered Johnson trying to get underneath it. FN4 After Clark told him to come out, Johnson said someone was chasing him and asked for a jacket because he was cold. Johnson appeared "sweaty," but did not appear to have any blood on him. After Clark gave him a jacket, Johnson crossed the street and hid underneath Hamon's truck. Clark also saw Harris in the area and heard her talking to Johnson when he was underneath Hamon's truck. Early the next morning, Clark saw Johnson was still underneath the truck, and he talked to Hamon about it later that day. When asked if he ever saw Johnson with a dog, Clark described a "little, bitty, like a little fu-fu dog or something. Quite a loud dog."

FN4: Clark did not know Johnson's name at the time.

Melinda Nutters knew Johnson by the nickname "Boog", and said he had a Pomeranian dog named "Little Boy." She never heard anyone at the auto yard refer to Johnson as Butch.

A police technician at the scene after the shooting photographed and collected samples of fresh blood from the top of the fence and the sidewalk. Johnson's DNA profile matched the blood samples when a statistical calculation indicated there was one chance in 236 billion that it would. The technician also photographed and collected three bullet casings from the shed, and a bullet was recovered there a few days later. A gun that was found on the roof of an adjacent building was determined to be the weapon used in the shooting, but police were unable to obtain fingerprints from it. The doctor who performed the autopsy on McClinton testified that he was probably killed by a bullet that passed through his left buttock and punctured two major blood vessels.

Inspector Bruce Brock was the primary investigator on the case. On the night of the shooting, Brock took a taped statement from Gaspari who said the shooter's voice was high pitched, loud, "sore," and similar to the voice of a man Gaspari referred to as Booker who was at the lot earlier that day and drove a truck. The shooter's height and weight were also similar to the man who drove the truck, and he appeared to be in his late 40's. Gaspari told Brock that McClinton did not identify the shooter and suggested to Brock that he speak with McClinton's former girlfriend, Keely Coffman. Brock had been told McClinton called the shooter Butch, but could not recall whether he mentioned that name to Gaspari.

When Brock interviewed Coffman, she directed him to Hamon, who described his

4

encounter with the man underneath his truck on the night of McClinton's murder. Through other sources, Brock learned that Johnson owned a car that was parked in the auto yard at the time of the shooting.  He put together a photo lineup containing Johnson's photo, and showed it to Hamon, who recognized Johnson as the man who hid under his truck.

Johnson was arrested approximately a week after the shooting and had scratches on his back and lower leg, and a healing scab on his left ankle.  When he was arrested he asked the officers to take care of his dog.

Shortly before trial, Brock obtained positive identifications of Clark and Harris when he showed their photos to Hamon.  When Brock interviewed Harris, she described how she saw a man underneath a truck around the time of McClinton's shooting and reluctantly identified him in a photo lineup.  Brock interviewed Clark the following day, and he also identified the man who hid underneath Hamon's truck in a photo lineup.  Clark also told Brock that he thought he saw McClinton "having words" with Johnson.

Coffman testified for the defense that she once lived with McClinton, and last saw him on the evening he was killed.  McClinton introduced Johnson to her as Booker, and Coffman never heard McClinton call Johnson by a different name.  Coffman had heard about someone named Butch who she believed was Johnson's older brother.  She did not believe Johnson was Butch, and she had no idea what Butch looked like.

Johnson was charged with murder with personal use and discharge of a firearm causing great bodily injury, and possession of a firearm by a felon. FN5  The jury found Johnson guilty on both counts and found the firearm enhancements true.  The court denied Johnson's new trial motion and sentenced him to 50 years to life in prison consisting of consecutive terms of 25 years to life each for the murder and for discharge of a firearm causing great bodily injury.  The sentences on the remaining firearm enhancements were stayed.  The court also imposed a concurrent two-year midterm sentence for the possession of a firearm by a felon.  Johnson timely appealed.

FN5:  The information also alleged prior felony convictions that were dismissed on the prosecutor's motion.

Johnson, 2010 WL 3028944, at *1-3.

## DISCUSSION

### I.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a

person in custody pursuant to the judgment of a State court only on the ground that he is in

United States District Court
Northern District of California

custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams,

529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim.  In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006);  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir. 2002).  When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198; Himes, 336 F.3d at 853.

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review.  The Court of Appeal, in its opinion on direct review, addressed all but two of the claims Petitioner raises in the instant petition.  See Respondent's Ex. 6.  Thus, the Court of Appeal was the highest state court to have reviewed those claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

## II.  Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) his Confrontation Clause and due process rights were violated by the admission of hearsay evidence that he was sometimes known as "Butch;" (2)  his due process rights were violated by the admission of identification evidence that was the product of unduly suggestive photo arrays; and (3) cumulative constitutional error.  The Court addresses each claim in turn.

### A.  Testimony that Petitioner was Known as "Butch"

Petitioner argues that the trial court's admission of witness Robert Hamon's

testimony,  that he heard third parties refer to Petitioner as "Butch," violated Petitioner's constitutional rights to confront witnesses and to due process.   Petitioner also argues that the evidence was prejudicial because the victim's last words were that Butch was the person that shot him, Reporter's Transcript (RT) 470, and the only evidence that Petitioner was Butch was Hamon's third-hand knowledge.  Petition at 23.

Hamon testified to the following.  Hamon had known Petitioner for a number of years.  RT 359.  When he spoke to the person hiding under his truck at about 3 a.m. on the night of McClinton's murder, he recognized the man's voice as Petitioner's.  RT 358.  He had no doubt in his mind that the person hiding under his truck after McClinton was shot was Petitioner.  RT 373.  He knew Petitioner as "Larry" and "Booker."  RT 368-69.  Over a defense hearsay objection, Harmon testified that he had heard three people refer to Petitioner as "Butch."  RT 369-70.  The prosecutor argued that the statement was not offered for the truth of the matter asserted.  RT 368.  On cross-examination, Hamon testified that he did not hear anyone directly address Petitioner as "Butch," and that he had gotten the information "not second-hand but third-hand."  RT 389-90.

The state Court of Appeal held that Hamon's "Butch" testimony was inadmissible hearsay but, citing People v. Watson, 46 Cal. 2d 818, 836-37 (1956), found that, given the strength of the prosecutor's case,  it was not "reasonably probable that its admission affected the verdict."[4]  Johnson, 2010 WL 3028944, at *5.

### 1.  Confrontation Clause Claim

In the caption of his claim, Petitioner cites his right to confrontation but, in his argument, Petitioner focuses on the violation of his due process rights.  The state court did not address a confrontation rights claims.   In an abundance of caution, the Court independently reviews the record to determine if the state court's denial of this claim was an objectively unreasonable application of established federal law.

---

[4] In Watson, the California Supreme Court stated that a trial error required reversal when it has resulted in a miscarriage of justice, or "when the court, after an examination of the entire cause, including the evidence, is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  46 Cal. 2d at 836-37.

United States District Court
Northern District of California

United States District Court
Northern District of California

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S. 36, 61 (2004). It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. Id. The Confrontation Clause applies to all "testimonial" statements. Id. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (citation and quotation omitted).

When the primary purpose of taking an out-of-court statement is to create an out-of-court substitute for trial testimony, the statement is testimonial hearsay and Crawford applies. Michigan v. Bryant, 131 S. Ct. 1143, 1155 (2011). See, e.g., Bullcoming v. New Mexico, 131 S. Ct. 2705, 2712-14 (2011) (concluding that forensic lab report, prepared in connection with a criminal investigation, certifying that petitioner's blood alcohol level was above limit for aggravated DWI was testimonial). Hearsay that is not testimonial, "while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Davis v. Washington, 547 U.S. 813, 821 (2006). Only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." Id.

Under the circumstances of this case, the Confrontation Clause does not apply because the third-party statements referring to Petitioner as "Butch" were not testimonial. Although Hamon did not elaborate on how or where he heard third-parties say they knew Petitioner as Butch, no evidence indicates that the statements were made during an investigation or as a substitute for trial testimony. Petitioner offers no argument in regard to his Confrontation Clause claim and specifically does not argue that the third-party statements were testimonial. Based on an independent review of the record, the state

1   court's denial of this claim was objectively reasonable.

2               **2. Due Process Claim**

3          Petitioner argues that his due process rights were violated because the third party

4   statements that he was known as "Butch" were unreliable hearsay evidence.

5          The admission of evidence is not subject to federal habeas review unless a specific

6   constitutional guarantee is violated or the error is of such magnitude that the result is a

7   denial of the fundamentally fair trial guaranteed by due process.  Henry v. Kernan, 197

8   F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).

9          Failure to comply with state rules of evidence is neither a necessary nor a sufficient

10  basis for granting federal habeas relief on due process grounds.  Estelle v. McGuire, 502

11  U.S. 62, 67 (1991); Henry, 197 F.3d at 1031; Jammal v. Van de Kamp, 926 F.2d 918, 919

12  (9th Cir. 1991).   The due process inquiry in federal habeas review is whether the

13  admission of evidence was arbitrary or so prejudicial that it rendered the trial

14  fundamentally unfair.  Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley, 784

15  F.2d at 990; Rupe v. Wood, 93 F.3d 1434, 1444 (9th Cir. 1996).  Only if the jury can draw

16  no permissible inferences from the evidence can its admission violate due process.

17  Jammal, 926 F.2d at 920.  The Supreme Court "has not yet made a clear ruling that

18  admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

19  sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101

20  (9th Cir. 2009).  Even if an evidentiary error is of constitutional dimension, the court must

21  consider whether the error had a substantial and injurious effect on the verdict.  Brecht,

22  507 U.S. at  638;  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

23         The Court of Appeal's finding that the evidence was inadmissible hearsay because

24  it was admitted for the truth of the matter was not unreasonable.  However, failure to

25  comply with state rules of evidence is not a basis for granting habeas relief.  Habeas relief

26  is warranted only when the evidence is so arbitrary and prejudicial that it rendered the trial

27  unfair.

28         A review of the record demonstrates that the prosecutor's case against Petitioner

United States District Court
Northern District of California

was strong, so that even if the admission of Hamon's hearsay testimony constituted error, there was no due process violation.  As noted by the Court of Appeal, Petitioner's identity as the murderer was supported by physical evidence and the testimony of many witnesses. Johnson, 2010 WL 3028944, at *5.

Strong physical evidence pointed to Petitioner as the person who shot McClinton. First, Petitioner's DNA matched the blood found on the gate post and sidewalk where, immediately after McClinton was shot, witnesses Gaspari and Hernandez saw a man jump over the razor-wire-topped fence that enclosed the premises where the shooting took place. RT 105, 118-19; 311-15.  Second, when Petitioner was arrested approximately a week after the murder, scratches on his back and right shin and a healing scab on his left ankle were consistent with injuries he could have sustained when jumping over the razor-wire-topped fence.  RT  593-94.

Some of the most salient incriminating testimony is as follows.  Gaspari testified that the dying victim told him the man who shot him was called something that sounded like "Booker," a name that Petitioner does not dispute is one of his nicknames.  RT 162. Gaspari, Hamon, Clark and Harris all identified Petitioner.  Clark, Hamon, and Harris provided corroborating testimony regarding Petitioner's movements on the night of the murder.  Clark saw and spoke to Petitioner at Clark's motor home immediately after the murder, when Petitioner was trying to hide underneath it.  When Clark told Petitioner he had to leave, he saw Petitioner go across the street and hide underneath Hamon's truck. Clark saw Harris speak to Petitioner when he was hiding under Hamon's truck and Harris testified that she did speak to Petitioner when he was underneath the truck.  Harris testified that Petitioner told her that he had just shot McClinton.  Harris told Hamon there was someone hiding under his truck.  Hamon went to check and spoke to Petitioner as he was hiding under his truck.  Hamon knew Petitioner and recognized his voice.  These three witnesses' corroborating testimony is evidence that Petitioner was, in fact, hiding under Hamon's truck immediately after McClinton was shot, strongly suggesting that Petitioner was the shooter.  One of them testified that he had confessed to the shooting.

United States District Court
Northern District of California

1    Further evidence showed that Petitioner had a dog, as did the man hiding under

2    Hamon's truck.  Many witnesses testified that McClinton and Petitioner had a recent

3    argument, thus providing a motive.   The totality of this evidence produced a strong case

4    that Petitioner was the person who shot McClinton.

5    Moreover, because the jury knew that Hamon's "Butch" testimony was not based

6    upon his personal knowledge, but upon third-hand hearsay, it would likely give it less

7    significance.  Finally, the district attorney did not dwell on this evidence.  In her opening

8    statement, she mentioned  that Hamon  would  testify that, even though he knew Petitioner

9    by the name of Booker, he thought his name was Larry or Butch.  RT  77.  In her closing

10   argument, the prosecutor stated:

> Inspector Brock says, "Well, what's his name?"  [Hamon] says, "Well, I know him
> as Booker.  But I also know he goes by Larry or Butch."  That's what he said from
> the beginning.  And there's no evidence that he knew one of the police officers was
> told by the victim when he was dying that the name was Butch.  There's no
> evidence of that.  He's just telling you what he knew at the time.  But he knew it
> was Booker regardless, regardless, that's the guy right there, the defendant, who
> was hiding underneath his truck.

16   RT  719-20.

17   Given the weight of the evidence against Petitioner, Hamon's testimony that other

18   people knew Petitioner as Butch was not arbitrary or so prejudicial that it rendered the trial

19   fundamentally unfair.  Neither does the error constitute prejudice under Brecht; in light of

20   the strong case against Petitioner, the admission of Hamon's testimony did not have a

21   substantial and injurious effect on the verdict.

22   Petitioner makes an argument regarding the correct standard for analyzing

23   prejudice.  Although Petitioner cites the Brecht standard for prejudice in his brief, he

24   appears to argue that habeas relief must be granted unless the prosecutor shows that the

25   error was harmless beyond a reasonable doubt.  He also argues that the state court's

26   determination of no prejudice deserves no deference because it analyzed prejudice under

27   the "lenient" standard set forth in People v. Watson, 46 Cal. 2d 818, 836 (1956) instead of

28   the standard set forth in Chapman v. California, 386 U.S. 18, 24 (1967).  Petition at 22-23.

As discussed previously, in <u>Watson</u>, the California Supreme Court held that constitutional error did not require reversal unless it was "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." 46 Cal. 2d at 836.  In <u>Chapman</u>, the United States Supreme Court held that, before a state court may rule that a constitutional error is harmless, it "must be able to declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  The Court later clarified that <u>Chapman</u> was a case on direct review of a state court criminal judgment, and that in <u>Brecht</u>, 507 U.S. at 631, a criminal case on collateral review, the Court rejected the <u>Chapman</u> standard in favor of the more forgiving standard, that an error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." <u>Fry v. Pliler</u>, 551 U.S. 112, 116 (2007).   A federal habeas court does not review the state court's prejudice analysis for reasonableness; that issue is subsumed by the <u>Brecht</u> test for prejudice.  <u>Id.</u> at 120

Pursuant to the above Supreme Court authority, Petitioner's two arguments regarding prejudice are meritless.  On federal habeas review, the <u>Brecht</u> standard for prejudice applies, not the <u>Chapman</u> standard.  Furthermore, because a federal habeas court applies the <u>Brecht</u> standard, it does not defer to the state court's prejudice analysis.

Accordingly, Petitioner's due process claim based on Hamon's hearsay testimony does not warrant habeas relief.

**B.  Photo Lineups**

Petitioner argues that the photo lineups that the police showed to witnesses Clark and Harris were unduly suggestive and unreliable.

### 1.  Federal Authority

Due process requires suppression of eyewitness identification evidence "when law enforcement officers use an identification procedure that is both suggestive and unnecessary." <u>Perry v. New Hampshire</u>, 132 S. Ct. 716, 718 (2012); <u>Manson v. Brathwaite</u>, 432 U.S. 98, 107-09 (1977); <u>Neil v. Biggers</u>, 409 U.S. 188, 196-98 (1972).

Improper state conduct in arranging unnecessarily suggestive pretrial identification

procedures alone does not require exclusion of in-court identification testimony; the reliability of the eyewitness testimony is the "linchpin" in determining its admissibility. Manson, 432 U.S. at 100-14; see United States v. Drake, 543 F.3d 1080, 1089 (9th Cir. 2008).  Identification testimony is inadmissible as a violation of due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure.  Van Pilon v. Reed, 799 F.2d 1332, 1338 (9th Cir. 1986).  A reviewing court may assume suggestiveness and review reliability first. Id. at 1339.

An identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual thereby increasing the likelihood of misidentification. United States v. Bagley, 772 F.2d 482, 493 (9th Cir. 1985).  In determining whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification.  Manson, 432 U.S. at 114; Neil, 409 U.S. at 199-200.

### 2. Clark's Identification

The Court of Appeal rejected the claim regarding Clark's identification of Petitioner as follows:

> Johnson moved in limine to exclude Clark's photo identification, arguing the conduct of the lineup was unduly suggestive.  Johnson claimed the lineup was unfair because Clark said the person he saw under Hamon's truck could be either photo No. 2 or No. 4, and the other pictures did not look like either of them. Johnson also claimed Inspector Brock repeatedly suggested that Clark saw No. 4, and that Brock had Clark initial No. 4, even though Clark was uncertain of his identification.  The trial court refused to exclude Clark's identification, stating that defense counsel could attack the suggestiveness and accuracy of the identification on cross-examination.  Defense counsel also wanted the court to listen to an audio recording of the identification procedure. The court declined to do so, but ruled that

defense counsel could use it when he cross-examined Clark.  FN8

 FN8:  Defense counsel apparently used the transcript of the recording when cross-examining Clark.

Clark testified that when Inspector Brock contacted him approximately three years after the shooting, he showed Clark a six-photo lineup.  Clark recognized the person shown in No. 4, and put his initials on that picture.  Clark also thought photo No. 6 was a possibility, and asked Brock if No. 2 and No. 4 were the same photo, but Brock said he could not give him an answer.  FN9  When he met with the prosecutor approximately two weeks later, Clark said he thought he picked "the right guy" because "after reflection, the person that I met [approximately a week before McClinton's murder] was the same person who was under my motor home, without a doubt in my mind."

 FN9:  On cross-examination, when asked to confirm that the officer said No. 2 and No. 4 were pictures of different people, Clark responded: "I don't remember what he actually said at that point, but they said they couldn't tell me if that was the person that they were inquiring about."

On cross-examination, Clark testified that he was first drawn to photo No. 4.  He considered No. 2 also a possibility, but "as [he] looked at it further, it was No. 4."  When Officer Brock asked him, "So it's between 2 and 4, but you think it's 4?"  Clark said, "Yeah, I kind of think it's 4, though."  The officer asked Clark to initial No. 4.  Clark acknowledged it was a long time between seeing the man under his truck and his identification, and he made that clear to the officers during the photo lineup.  Inspector Brock acknowledged that he was not sure he admonished Clark before he showed him the lineup.  But otherwise, he essentially corroborated Clark's account and he was not cross-examined on the details of the lineup.

Johnson argues that Clark's photo lineup was unduly suggestive because Brock could not recall whether he first admonished Clark that the lineup might or might not contain the suspect's photo and that he was under no obligation to make an identification.  But Johnson cites no authority that requires such an admonition in every case.  . . . Johnson also contends Clark was uncertain of his identification of No. 4 during the lineup, and Brock directed Clark's attention to Johnson's photo "by asking him questions about it."  FN10  But in context, the record does not indicate that any of the officer's questions were unduly suggestive, nor does Johnson argue that his photo stood out from the others in any way that was inherently unfair.  . . . Johnson has not carried his burden to show that Clark's photo lineup identification was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  (People v. Sanders (1990) 51 Cal. 3d  471, 508.)  Nor has he shown the identification was unreliable under the totality of the circumstances.  Even though Clark viewed the photo lineup several years after the shooting, he knew Johnson before McClinton's murder.

Clark had a good opportunity to observe Johnson on the night of the shooting when he spoke with Johnson outside his motor home.  While Johnson now argues "[t]he circumstances under which Clark saw Johnson were not associated with an important or significant event-such as witnessing a crime," Clark testified the events were "memorable," particularly in view of his earlier meeting with Johnson at the warehouse.

 FN10:  Brock asked Clark, for example, "What is it about 4 or what makes you think 4 looks more like him? Is there any identifiable reason?"  Johnson claims in his reply brief "[t]here is no wrong answer to the question of which photograph looks 'more like' a person," but that concern appears to go more to the reliability of the identification than to its suggestiveness.

When shown the photo lineup, Clark first identified No. 4, and he later confirmed that selection when he spoke with the prosecutor.  Johnson seizes on Clark's statement to the prosecutor that he "picked the right guy" as evidence that Clark "thought there was a right answer he was expected to give."  But in context, the statement is more reasonably interpreted to mean that Clark was sure the person he previously spoke with was the same person he saw under his motor home on the night of the shooting.

Johnson, 2010 WL 3028944, at *6-8.

Petitioner argues that the state court erred in finding that Clark's identification was neither suggestive nor unreliable.  First, Petitioner contends that the lineup was unduly suggestive because Brock directed Clark's attention to Petitioner's photograph in position number 4.  He cites to the fact that when Clark was undecided between photograph numbers 2 and 4, Brock asked him, "What is it about 4 or what makes you think 4 looks more like him?  Is there any identifiable reason?"  Petition at 28 (citing RT 454-56).  He also cites to the fact that, when Clark asked if numbers 2 and 4 were the same person, Brock told him they were two different people.  Id.  Finally, Petitioner cites to the fact that, even though Clark repeatedly said he thought it was number 4, he was unsure if it was 2 or 4 and Brock then said, "Initial number 4."  Id. (citing RT at 457).

The evidence shows that Clark kept indicating that he thought number 4 was the person he saw on the night of the murder, but was hesitant to make a final decision.  RT 431, 453-55.  Brock's asking what made number 4 look more like the person Clark saw was not unduly suggestive; it followed from Petitioner's focus on number 4.  Likewise,

Brock's statement that photographs 2 and 4 were of different people was not unduly suggestive;  Brock merely answered Clark's question and cleared up Clark's confusion that photos 2 and 4 were the same.  Furthermore, the fact that Clark thought photos number 2 and 4 depicted the same person indicates that Petitioner's photo did not stand out in the photo array.  Finally, Brock did not ask Clark to initial number 4 until Clark had repeatedly said that he thought number 4 was the correct person.   Additionally, the fact that the officers told Clark that they could not tell him if "that was the person they were inquiring about," RT 456, indicates that the officers conducting the identification did not point to any one photograph in an unduly suggestive manner.   Accordingly, the state court's finding that the identification procedure was not unduly suggestive was reasonable.

Petitioner argues that the identification was unreliable because: (1) Clark only had a brief interaction with the suspect on a dark street outside his motor home; (2) at the time Clark saw the suspect, he did not know that a crime had been committed, so his attention to detail was minimal; and (3) his identification of Petitioner from the photo line-up took place three years after he met the suspect at his motor home.

Although Clark's identification took place years after the incident in question, there were many other indicia of reliability.  Clark met Petitioner before the crime took place at a warehouse, where they had a face-to-face conversation that lasted about forty-five minutes to one hour.  RT 413-15.  Only one week later, Clark came in contact with Petitioner on the night of McClinton's murder.  RT 423.  At approximately 11:30 pm, Clark felt his motor home moving.  RT 423-24.  He got a flashlight, went outside, saw Petitioner trying to get underneath his motor home and told Petitioner to leave.  RT 424.  Petitioner complied with Clark's order and Clark went back inside.  RT 424.  A couple of minutes later, Petitioner knocked at the motor home door, told Clark someone was chasing him, and that he was cold.  RT 424.  Petitioner asked for a jacket and Clark gave one to him.  RT 425.   Clark then saw Petitioner walk across the street and hide underneath Hamon's truck.  RT 426.  At trial Clark testified that there was no doubt in his mind that the person he met at the warehouse was the same person who was under his motor home

17

1  and that person was Petitioner.  RT 431-32.

2        This evidence shows that Clark had ample opportunity, at least forty-five minutes to

3  an hour, to view Petitioner before the crime occurred, when they were directly engaged in

4  a face-to-face conversation with each other.  On the night of the murder, Clark went out of

5  his motor home with a flashlight so the area was not in total darkness.  Not only did Clark

6  see Petitioner outside at night, but he viewed Petitioner close up when Petitioner came to

7  Clark's door to ask for a jacket, which Clark gave to him.  Furthermore, on the night of the

8  murder, Clark's meeting with Petitioner was memorable, because it occurred in the

9  unusual circumstance of Petitioner trying to hide under Clark's motor home.  See  RT 444

10 (Clark testified that these events were memorable to him because he had the opportunity to

11 view Petitioner face-to-face at his motor home in conjunction with just having met him at

12 the warehouse).  Thus, rather than paying minimal attention to detail, the unusual

13 circumstances confronting Clark may have heightened his attention to detail.  Another

14 strong indicator of reliability is that, once Clark identified photograph number 4 as the

15 person he saw at his motor home on the night of the murder, he was positive he was

16 correct.

17       These indicia of reliability outweigh the fact that Clark's identification of Petitioner

18 in the photo array took place three years after the murder.

19       Accordingly, the Court of Appeal's denial of this claim was not contrary to or an

20 unreasonable application of federal authority or an unreasonable determination of the facts.

21            **3.  Harris's Identification**

22       The Court of Appeal rejected the claim that Harris's identification of Petitioner was

23 unduly suggestive and unreliable as follows:

24       Johnson also challenges Harris's photo lineup identification.  FN11  He says the
25       procedure used by Brock was unduly suggestive for two reasons.  First, Brock
          commented that Harris initially looked at photo No. 6, and that his comment
26       "suggested an answer" to her when, in fact, she was looking at photo No. 1.
          Second, he challenges Brock's instruction to Harris that she choose the person who
27       looked "most like" the man she saw hiding under the truck.  This, Johnson says, led
28       Harris to think she did not need to make a positive identification.  Neither reason is

United States District Court
Northern District of California

persuasive.

 FN11:  Defense counsel did not move to exclude Harris's photo lineup identification at trial, but we address the issue on the merits because Johnson argues that counsel's failure to do so constituted ineffective assistance of counsel.

Brock's comment about photo No. 6 was to the effect that he saw Harris's eyes go to photo No. 6 right away when she first saw the lineup.  He did not comment substantively on the person in the photograph, and made no comment to Harris that suggests the person depicted in photo No. 6 was the person hiding under the truck or the one who shot McClinton.  Moreover, Harris promptly corrected Brock and told him she was looking instead at photo No.1.  In the circumstances, it does not appear this exchange had an unduly suggestive effect on the lineup.

The potential suggestiveness of Brock's comment to Harris that she pick the man who looked "most like" the man hiding under the truck must also be considered in its context.  When Brock testified, he explained that his direction to Harris was designed to allay her stress and render her more at ease with the process of identification.  She was a reluctant participant in the interview who was previously acquainted with Johnson and one of the other men depicted in the lineup.  FN12  In these circumstances, the significance of Brock's comments seem more suitable for challenge by cross-examination because they go more to the reliability of Harris's identification than the suggestiveness of the lineup.  We cannot conclude that Brock's comments to Harris were so suggestive that they created a likelihood she would identify the wrong person.  (See People v. Cunningham, 25 Cal. 4th at 989-990.)

FN12:  Harris was also reluctant to identify Johnson in the preliminary hearing and at trial.  In context, it appears more likely her reluctance was attributable to a concern that her testimony would put her in danger, rather than any uncertainty over Johnson's identity.

Johnson, 2010 WL 3028944, at *8.

Petitioner argues that the Court of Appeal wrongly assumed that Harris was reluctant to identify Petitioner in the preliminary hearing and at trial.  Petitioner is correct that Harris did not testify at Petitioner's preliminary hearing.  However, at the trial, Harris stated a number of times that she did not want to testify and she did not want to identify anyone or get anyone in trouble.  See e.g., RT 257, 258, 263, 269-70, 281-83.  Therefore, the state court's finding that Harris was reluctant to identify Petitioner at trial was not unreasonable.  The state court's incorrect assumption that Harris testified at the

preliminary hearing does not affect its conclusion that Harris was a reluctant witness.

Petitioner argues Harris's identification was unduly suggestive on the same grounds as he raised in state court.  The state court's determination that the identification was not unduly suggestive was reasonable.  The fact that Brock said to Harris that her eyes went to photograph number six in the lineup, which was Petitioner's photograph, was not unduly suggestive because Brock's comment did not indicate in any way that number six was the person Harris spoke to on the night of the murder.  Furthermore, Harris immediately corrected Brock and told him that she was looking at photograph number one.  RT 273.  And, as the state court reasonably concluded, Brock's statement that Harris pick someone who looked like Petitioner, in context, did not make the identification unduly suggestive because it was obvious that Harris was uncomfortable with the process and Brock wanted to put her more at ease.  See RT  257, 258, 269-70 (Harris testimony); RT 612-15 (Brock testimony).

According to Petitioner, when Harris would not circle photograph number six, Brock did it for her.  Petition at 33.  However, Harris testified that, when Brock asked her to identify the person under the truck, she said, "It looks like No. 6."  RT 284.  When Brock asked her to circle number six, Harris told him, "Why don't you circle it?"  RT 284-85.  Thus, although Brock circled number six, he did so at Harris's request after she identified number six as the man under the truck.

Petitioner argues that Harris's identification was unreliable because: (1) Harris did not see the person hiding under the truck, she only heard the person's voice; (2) she could not make an in-court identification of Petitioner as the person under the truck; (3) she was reluctant at the time of the identification to choose a photograph; and (4) the identification from the photo array took place more than three years after the incident.

The state court did not address whether the identification was reliable.  Therefore, the Court independently reviews the record to determine if the state court's denial of this claim was objectively reasonable.

Although there are unreliable aspects to Harris's identification, other indicia

United States District Court
Northern District of California

1   indicate the identification was reliable.  As discussed above, Harris was a reluctant witness

2   and did not want to implicate anyone.  The district attorney worked hard to elicit relevant

3   testimony from Harris.  When Harris was asked by the district attorney if she knew

4   Petitioner, who was sitting at the defense table, Harris replied that she "somewhat"

5   recognized him and that she "saw him before somewhere," but didn't remember where.

6   RT 253.  She testified that, on the night of the murder, she heard someone call her by

7   name.  RT 254.  She went across the street to see what the person wanted and, although

8   she could not see him because he was hiding under a truck, she "just knew it was the guy

9   that used to be around by the yard."  RT 255.    The man under the truck told Harris that "I

10  just shot Wallace."  RT 256.  The man under the truck asked Harris to check on his dog,

11  which was in his truck located in the front yard.  RT 257.  Harris had seen the man drive

12  the truck once or twice before and had seen the dog.  RT 258.  She described the dog as

13  little and furry.  RT 258.  When the district attorney asked Harris if she had seen Petitioner,

14  as he sat at the defendant's table in the courtroom, with the dog, Harris responded that he

15  looked different because she didn't remember him being as bald or as heavy-set.  RT 258-

16  59.  Other testimony indicated that Petitioner was heavier at the trial than he was three

17  years prior when the murder took place.

18         Harris's testimony shows that she was familiar with the man hiding under the truck,

19  she knew his dog and the truck he drove.  Although she did not see the man that night, she

20  immediately identified him as "the man who used to be around the yard."  Although she

21  did not want to identify Petitioner as the man under the truck, she correctly identified his

22  photograph from the photo array and inadvertently identified the man at the defendant's

23  table in the courtroom as the man with the dog.

24         The above-cited evidence constitutes sufficient indicia of reliability to overcome the

25  facts that the identification took place three years after the events in question and that

26  Harris did not actually see the man who was hiding under the truck that night.

27         Based on an independent review of the record, the Court finds that the state court's

28  denial of Petitioner's claim based on the reliability of Harris's identification was an

1    objectively reasonable application of clearly established federal law.

2         Furthermore, as previously discussed, the case against Petitioner was strong so that,

3    even without the identifications by Clark and Harris, there was sufficient other evidence

4    demonstrating Petitioner's guilt.  Therefore, any error in admitting these identifications did

5    not have a substantial or injurious effect on the verdict.

6         Accordingly, habeas relief on this claim is denied.

7    **C.  Cumulative Error**

8         Petitioner argues that the cumulative effect of the erroneously admitted hearsay

9    evidence and unduly suggestive identifications by Clark and Harris violated his rights to a

10   fair trial and due process.

11        In some cases, although no single trial error is sufficiently prejudicial to warrant

12   reversal, the cumulative effect of several errors may still prejudice a defendant so much

13   that his conviction must be overturned.  Alcala v. Woodford, 334 F.3d 862, 893-95 (9th

14   Cir. 2003).  Cumulative error is more likely to be found prejudicial when the government's

15   case is weak.  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  Where there

16   is no single constitutional error existing, nothing can accumulate to the level of a

17   constitutional violation.  Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011); Mancuso v.

18   Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).  Similarly, there can be no cumulative error

19   when there has not been more than one error.  United States v. Solorio, 669 F.3d 943, 956

20   (9th Cir. 2012).

21        Here, the Court has found that there were no constitutional violations, therefore,

22   nothing can accumulate to the level of a constitutional violation.  Furthermore, even if

23   there was cumulative error, it was harmless under Brecht, because sufficient admissible

24   evidence pointed to Petitioner as the person who shot and killed McClinton.

25        The Court of Appeal acknowledged that it found that the admission of Hamon's

26   hearsay evidence was error, but because it concluded the error was harmless and rejected

27   all of Petitioner's other claims, it denied his claim of cumulative error.  Johnson, 2010 WL

28   3028944 at *9.  The Court of Appeal's ruling was not objectively unreasonable.

United States District Court
Northern District of California

Accordingly, Petitioner's claim of cumulative error does not warrant habeas relief.

## III.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability is denied.

### CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

Additionally, the Clerk is directed to substitute Martin Biter on the docket as Respondent in this action.

**IT IS SO ORDERED**.

Dated:  June 18, 2013

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

G:\PRO-SE\JST\HC.11\Johnson v Lopez 11-5026.dny.hc.rmh.docx

23